

**MATTHEW L. SHARP, LTD.**
Matthew L. Sharp.
432 Ridge St.
Reno, NV 89501
Phone: (775) 324-1500
Email: matt@mattsharplaw.com

*Attorneys for Plaintiff*

[***Additional Counsel Listed Below***]

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| MARTIN ARANZABE, Derivatively on Behalf of LIVE VENTURES INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>JON ISAAC, TONY ISAAC, RICHARD D. BUTLER, JR., DENNIS (DE) GAO, and TYLER SICKMEYER,<br><br>Defendants,<br><br>and,<br><br>LIVE VENTURES INCORPORATED,<br><br>Nominal Defendant. | Case No.:   2:17-cv-1632<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Martin Aranzabe ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Live Ventures Incorporated ("Live Ventures" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Live Ventures with the U.S. Securities and Exchange

1  Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts,
2  publicly available filings in lawsuits, and matters of public record.

3  ## NATURE OF THE ACTION

4      1.    This is a shareholder derivative action brought in the right, and for the benefit of, Live
5  Ventures against certain of its officers and directors seeking to remedy Defendants' breach of fiduciary
6  duties and unjust enrichment that occurred between November 7, 2016 to the present (the "Relevant
7  Period") and have caused substantial harm to Live Ventures.

8      2.    Live Ventures is a holding company for diversified businesses.  In 2015, it began a
9  strategic shift away from solely providing online marketing solutions for small and medium business to
10  acquiring profitable companies in various industries that have demonstrated a strong history of earnings
11  power.  The Company began trading on The NASDAQ Capital Market under the symbol LIVE on
12  February 8, 2002.

13      3.    During the Relevant Period, Defendants (defined below) engaged in reckless and callous
14  business practices and failed to exercise even a modicum of due diligence.  Specifically, Defendants
15  caused the Company to issue numerous false and misleading statements directly and by way of
16  independent analyst research reports posted on investor websites such as *seekingalpha.com*.  At least
17  nine such articles were published by just one author, Michael J. Markowski ("Markowski").
18  Defendants' promotional campaign was incredibly successful.  The Company's share price rose from
19  $11.58 per share on November 8, 2016 to $27.68 on December 28, 2016.

20      4.    Defendants failed to disclose that: (a) these bullish articles touting the Company stock
21  were actually commissioned by the Company using its paid promoter(s), and (b) that its December 28,
22  2016 press release included a false and/or misleading earnings per share number.

23      5.    On January 6, 2017, Richard Pearson ("Pearson") published an article on
24  *SeekingAlpha.com* entitled "Live Ventures Exposed: Massive Paid Promotions, Heavy Accounting
25  Manipulation, Deficient Auditor and More."  Pearson reported that Live Ventures had reported a false
26  earnings per share number in its December 28, 2016 press release, and paid money to Markowski and
27  others to publish articles praising the Company and its prospects and to spearhead a misleading
28  informational campaign aimed at boosting its stock price.

6.     Since the Company remains under the control and/or influence of the primary wrongdoers, namely Defendants who: (a) have made decisions in violation of the business judgment rule, (b) have substantial conflicts, and (c) may be implicated in the commission of the wrongful conduct alleged herein, the Company is unable to protect itself or remedy the wrongs inflicted upon it. Accordingly, this derivative action must be brought and vigorously prosecuted to protect and vindicate the rights of the Company.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

8.     Venue is proper in this Court under 28 U.S.C. § 1931(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

9.     *Plaintiff Martin Aransabe* is, and at all relevant times was, a shareholder of Live Ventures. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation. Plaintiff is a citizen of Massachusetts.

**Nominal Defendant**

10.     *Nominal Defendant Live Ventures Incorporated* ("Live Ventures") is a Nevada Corporation with its principal executive offices located at 325 East Warm Springs Road, Suite 102, Las Vegas, Nevada 89119. Live Ventures is a holding company for diversified businesses.

**Director Defendants**

11.     *Defendant Jon Isaac* ("J. Isaac") is, and at all relevant times was, the Company's Chief Executive Officer ("CEO"), President, and director. J. Isaac joined the Company in December 2011, and became President and CEO in January 2012. J. Isaac is also the founder of the Isaac Capital Group, the Company's largest stockholder holding approximately 49.5% of the Company's outstanding shares of common stock at the time of the events described herein. By virtue of his control over the

1  Isaac Capital Group, J. Isaac has the sole power to vote the shares of Live Venture's common stock
2  owned by Isaac Capital Group, and as a result, is able to effectively control all matters that require the
3  Company to obtain shareholder approval, including the election of directors to Live Venture's Board of
4  Directors ("Board"). Plaintiff is informed and believes and thereon alleges that J. Isaac is a citizen of
5  California.

6       12. **Defendant Tony Isaac** ("T. Isaac") has served as a director of Live Ventures since
7  December 2011 and began serving as the Company's Financial Planning and Strategist/Economist in
8  July 2012. T. Isaac is the father of J. Isaac. Plaintiff is informed and believes and thereon alleges that
9  T. Isaac is a citizen of California.

10      13. **Defendant Richard D. Butler, Jr.** ("Butler") has been a member of the Company's
11 Board since August 2006, and is a member of the Company's Audit Committee. Butler is also the
12 Chairman and may be the sole member of the Company's Nominating and Corporate Governance
13 Committee. Butler may also be a member of the Company's Compensation Committee. Plaintiff is
14 informed and believes and thereon alleges that Butler is a citizen of California.

15      14. **Defendant Dennis (De) Gao** ("Gao") has been a member of the Company's Board since
16 January 2012, and is Chairman of the Company's Audit Committee. Gao may also be a member of the
17 Company's Compensation Committee and Nominating and Corporate Governance Committee.
18 Plaintiff is informed and believes and thereon alleges that Gao is a citizen of Nevada.

19      15. **Defendant Tyler Sickmeyer** ("Sickmeyer") has been a member of the Company's Board
20 since August 2014, and is a member of the Company's Audit Committee. Sickmeyer may also be a
21 member of the Company's Compensation Committee and Nominating and Corporate Governance
22 Committee. Plaintiff is informed and believes and thereon alleges that Sickmeyer is a citizen of
23 California.

24      16. Defendants J. Isaac, T. Isaac, Butler, Gao and Sickmeyer are hereinafter referred to as
25 the "Director Defendants" or "Defendants."

26 ///
27 ///
28 ///

4

**CODE OF BUSINESS CONDUCT AND ETHICS,
GOVERNANCE AND NOMINATING COMMITTEE CHARTER
<u>AUDIT COMMITTEE CHARTER</u>**

17.    As members of Live Venture's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business.

18.    Live Ventures' Code of Business Conduct and Ethics states in part:

> We must strive to foster a culture of honesty and accountability.  Our commitment to the highest level of ethical conduct should be reflected in all of the Company's business activities including, but not limited to, relationships with employees, IAP advertisers, suppliers, competitors, the government and the public, including the Company's shareholders. All of the Company's employees, officers and directors must conduct themselves according to the language and spirit of this Code and seek to avoid even the appearance of improper behavior.
>
> \*       \*       \*
>
> COMPLIANCE WITH LAWS, RULES, AND REGULATIONS
>
> The Company is strongly committed to conducting its business affairs with honesty and integrity and in full compliance with all laws, rules and regulations in the cities and states in which we operate.  No employee, officer or director of the Company shall commit an illegal or unethical act or instruct others to do so, for any reason.
>
> \*       \*       \*
>
> FAIR DEALING
>
> Each employee, officer and director of the Company should endeavor to deal fairly with IAP advertisers, suppliers, competitors, shareholders, the public and one another at all times and in accordance with ethical business practices.  No one should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practice. No payment in any form shall be made directly or indirectly to or for anyone for the purpose of obtaining or retaining business or obtaining any other favorable action. The Company and the employee, officer or director involved may be subject to disciplinary action as well as potential civil or criminal liability for violation of this policy.
>
> \*       \*       \*
>
> QUALITY OF PUBLIC DISCLOSURES
>
> The Company has a responsibility to communicate effectively with shareholders so that they are provided with full and accurate information, in all material respects, about the financial condition and results of operations of the Company. The Company's Chief Executive Officer and all senior financial officers are responsible for full, fair, accurate, timely and understandable disclosure in periodic reports required to be filed by the Company with the Securities and Exchange Commission. For purposes of this Code, "senior financial officers" means the Company's principal financial officer, the Company's principal accounting officer or controller and other persons performing

similar functions for the Company. Accordingly, it is the responsibility of the Company's Chief Executive Officer and each senior financial officer promptly to bring to the attention of the Audit Committee of the Board of Directors any material information of which he or she may become aware that affects the disclosures made by the Company in its public filings or otherwise assist the Audit Committee in fulfilling its responsibilities.

The Company's Chief Executive Officer and each senior financial officer shall promptly bring to the attention of the Audit Committee or the Board of Directors any information concerning (a) significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

The Company's Chief Executive Officer and each senior financial officer shall promptly bring to the attention of the Audit Committee any information concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof.

\*      \*      \*

COMPLIANCE PROCEDURES

The Company recognizes the need for this Code to be applied equally to everyone it covers. The Company's Chief Executive Officer will have primary authority and responsibility for the enforcement of this Code, subject to the supervision of the Board of Directors, or, in the case of accounting, internal accounting controls or auditing matters, the Audit Committee or the Board of Directors, and the Company will devote the necessary resources to enable the Company's Chief Executive Officer to establish such procedures as may be reasonably necessary to create a culture of accountability and facilitate compliance with the Code. Questions concerning this Code should be directed to the Company's Chief Executive Officer.

19.   Live Ventures' Governance and Nominating Committee Charter states in part:

**Committee Membership**
***The Committee shall consist of no fewer than two members.*** Except as otherwise permitted by applicable law, rules, regulations, exchange listing standards and/or Section 301 of the Sarbanes-Oxley Act of 2002, each member of the Committee must be "independent" as defined for purposes of such law, rules, regulations and/or listing standards, including rules promulgated by the U.S. Securities and Exchange Commission (the "SEC"). The Committee shall monitor its members throughout the year to confirm that they all remain "independent." [Emphasis added]

**Authority and Responsibilities**
The Committee has the following authority and responsibilities:

Develop and recommend to the Board for its approval a set of corporate governance principles applicable to the Company and review such guidelines at least annually and recommend changes as necessary.

\*       \*       \*

Review annually the structure and operations of committees of the Board and the qualifications of members of Board committees, and recommend to the Board for approval the directors to serve or be removed as members of each committee and any subcommittee and to recommend additional committee members to fill any vacancies.

\*       \*       \*

Develop and oversee the evaluation of the Board and its committees, as well as the Company's management, which may include developing and recommending an annual self-evaluation process.

Evaluate annually the Committee's performance.

20.   Live Ventures' Audit Committee Charter states in part:

**Introduction**

Executive management of YP Corp. (the "Company") is primarily responsible for the completeness and accuracy of the Company's financial statements and reporting and the adequacy of its internal financial and operating controls. The Company's Board of Directors (the "Board") is responsible for overseeing management's exercise of these responsibilities. To assist the Board, the Company has established an Audit Committee (the "Committee"). The authority and responsibilities of the Committee are described in this Charter.

**Purpose**

\*       \*       \*

The purpose of the Committee is to assist the Board in overseeing (i) the integrity of the Company's accounting and financial reporting processes, the audits of the Company's financial statements, *as well as systems of internal controls regarding* finance, accounting, and *legal compliance*; (ii) *the Company's compliance with legal and regulatory requirements*; (iii) the qualifications, independence and performance of the Company's independent auditors; (iv) the Company's financial risk; and (v) the Company's internal audit function. In carrying out this purpose, the Committee shall maintain and facilitate free and open communication between the Board, the independent auditors and the Company's management.  [Emphasis added]

\*       \*       \*

**Authority and Responsibilities**

\*       \*       \*

///

///

7

**E.**   *Controls and Procedures*

*Oversight.*  The Committee shall coordinate the Board's oversight of the Company's internal controls over financial reporting, the Company's disclosure controls and procedures and the Company's code of conduct. The Committee shall receive and review the reports of the Chief Executive Officer and the Chief Financial Officer required by Rule 13a-14 of the Exchange Act.

\*       \*       \*

*Code of Business Conduct and Ethics.*   The Committee shall periodically review the Company's Code of Business Conduct and Ethics to ensure that it is adequate and up-to-date. Review with the Company's primary counsel the results of their review of the monitoring of compliance with the Company's Code of Business Conduct and Ethics.

## DUTIES OF DEFENDANTS

21.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Live Ventures, Defendants owed Live Ventures and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required Defendants to use their utmost abilities to control and manage Live Ventures in an honest and lawful manner.  Defendants were and are required to act in furtherance of the best interests of Live Ventures and its investors.

22.     Each director of the Company owes to Live Ventures and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

23.     To discharge their duties, the officers and directors of Live Ventures were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Live Ventures were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how Live Ventures conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives

24.    Each defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Live Ventures, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

25.     Live Ventures is a holding company for diversified businesses, and was formerly known as LiveDeal, Inc.  The Company describes its mission as ". . . delivering shareholder value by acquiring profitable, stable and growing companies."  The Company has multiple segments, which include manufacturing, marketplace platform, and services.  As of September 30, 2016, the Company operated its business through 13 divisions, each specializing in a distinct area of the business.

26.     Live Ventures website identifies two committees; Audit, and Nominating and Corporate Governance.  Additionally, on its website it lists only one member (Butler) of the Nominating and Corporate Governance Committee.  In its Form 10-K filed with the SEC on December 29, 2016 and for the year ended September 30, 2016 ("2016 Form 10-K"), Butler is also listed as a member of the Audit Committee, and the sole member/chair of the Nominating and Corporate Governance Committee.  However, in the Live Ventures Proxy Statement filed with the SEC on June 13, 2016 ("2016 DEF 14A"), Butler is mentioned as listed as a member of the Audit Committee, a member/chair of the Nominating and Corporate Governance Committee, *and* a member of the Compensation Committee.  The following is a chart identifying inconsistencies in committee membership comparing Live Ventures' website, 2016 10-K, and 2016 DEF 14A:

|  | Audit | | | Corporate Governance | | | Compensation | | |
|---|---|---|---|---|---|---|---|---|---|
|  | 12/29/16 10-K | 6/13/16 DEF 14A | Website | 12/29/16 10-K | 6/13/16 DEF 14A | Website | 12/29/16 10-K | 6/13/16 DEF 14A | Website |
| Jon Isaac |  |  |  |  |  |  |  |  |  |
| Tony Isaac |  |  |  |  |  |  |  |  |  |
| Richard D. Butler, Jr. | x | x | x | Chair | Chair | Chair |  | x |  |
| Dennis (De) Gao | Chair | Chair | x |  | x |  |  | x |  |
| Tyler Sickmeyer | x | x | x |  | x |  |  | x |  |

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE RELEVANT PERIOD

27.     On November 7, 2016, the Company issued a press release announcing that Live Ventures had acquired Vintage Stock, Inc. ("Vintage"), a retail chain that buys, sells, and trades products such as DVDs, CDs, and VHS movie and music tapes. The press release stated, in pertinent part:

> LAS VEGAS, NOVEMBER 7, 2016 - Live Ventures Incorporated (Nasdaq: LIVE) ("Live Ventures" or the "Company"), a diversified holding company, today announced it has acquired 100% of the

outstanding stock of entertainment retailer, Vintage Stock, Inc., in a cash and debt transaction valued at approximately $60M. The acquisition was financed by Texas Capital Bank (NASDAQ: TCBI) and Capitala Group (NASDAQ: CPTA). Live Ventures did not issue any stock or convertible securities in connection with this transaction. As a result of this highly accretive acquisition, *management expects Live Ventures' assets to increase to over $100M, annual sales to increase to $160M and net income to increase to $20M ($1.21 per share).*

Vintage Stock, along with its sub-brands, VStock, Movie Trading Company, and EntertainMart, is a Joplin, Missouri-based retail chain that buys, sells and trades entertainment products. Its product offerings include movies, music, video games for multiple consoles, as well as books, trading and game cards and collectables, including comic books, movie memorabilia, toys and novelties. The company operates 57 stores across 10 states and employs about 900 people. The acquisition increases Live Ventures' total employee count to about 1,200.

"Vintage Stock has proven quarter after quarter that it matches precisely our criteria for acquisition: very consistent and stable earnings over the past several years, an easy to understand business model, and a stellar management team. As a result of this highly accretive acquisition, we expect our financials to continue to improve significantly. This acquisition marks $100M in deals since we changed LiveDeal into a diversified holding company just last year," said Jon Isaac, CEO of Live Ventures Incorporated. "Vintage Stock's CEO, Rodney Spriggs, is truly a one-of-a-kind executive who has achieved tremendous success creating a unique and highly-profitable business model and expanding it systematically since the company's humble beginnings in 1980 as a used bookstore. We are proud to welcome Vintage Stock and its approximately 900 employees to the Live Ventures family."

28. On November 21, 2016, the Company issued a press release announcing its preliminary financial results for the quarter ended September 30, 2016. In the press release, Live Ventures noted that it expected record year-end financial results.

29. Further, in this press release Defendant J. Isaac stated:

We anticipate that our financials will improve even further as a result of the aggressive measures we take to pay down debt, our recent growth capital expenditures at Marquis Industries, Inc., and our recently announced acquisition of Vintage Stock, Inc. . . .  In the meantime, we anticipate that our year-end financial results will be a record for the Company, and will announce them toward the end of December.

30. Also on November 21, 2016, Markowski published an article on *Seeking-Alpha* entitled "Headwinds For S&P; Tailwinds For Small And Micro-Caps," where Markowski repeated Defendant J. Isaac's above assertions with even greater certainty:

11

> Live Ventures (NASDAQ: LIVE) with a market cap of $48 million has grown its revenue for three consecutive fiscal years. Based on its trailing 12 month financials the conglomerate's revenue will again increase for its year ending September 30, 2016. More importantly, after reporting negative CFFO for its last 3 fiscal years LIVE has produced positive CFFO for its last four consecutive quarters. Earlier this month LIVE announced that they had acquired a company for cash and debt that would take their revenue to $160 million and net income to $20 million ($1.21 per share). LIVE's business model is similar to Berkshire Hathaway's (NYSE: BRK.B) and has 33 year old CEO who is extremely disciplined. He reminds me of Buffet.

31. At the end of the November 21, 2016 article, Markowski represented:

> "I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it. I have no business relationship with any company whose stock is mentioned in this article."

32. In the wake of the November 7 and 21, 2016 representations described above, Live Ventures' share price surged, with shares rising from $11.58 on November 8, 2016 to nearly $28 by late December 2016.

33. On December 9, 2016, Live Ventures issued a press release announcing that it had completed a 1-for-6 reverse split of its outstanding common stock. The Company stated:

> As previously stated, one primary purpose of the reverse split was to broaden the appeal of the Company's stock to include institutional investors following the closing of the Company's second major acquisition in the past 18 months. Management continues to believe the Company's stock is undervalued and the Company continues to repurchase its shares in the market.
>
> Further, the reverse split was not undertaken to facilitate any financing transactions nor for NASDAQ compliance reasons, as the Company is in full compliance with all relevant NASDAQ standards
>
> As a result of the reverse stock split, every six shares of the Company's pre-reverse split common stock was combined and reclassified into one share of common stock. Further, the reverse stock split does not affect proportionate voting rights and other rights of common stockholders. Stockholders who would otherwise hold a fractional share of common stock received an increase to their common stock as the common stock was rounded up to a full share. No fractional shares were issued in connection with the reverse stock split.

34. On December 29, 2016, the Company filed its 2016 Form 10-K and issued a press release. In the press release, Live Ventures noted that its annual sales were only $120 million, falling short of earlier predictions of $160 million, which was in large part based upon the Company's false

1  and misleading statements concerning the likely impact the Vintage acquisition would have on
2  company earnings.

3        35.    On December 28, 2016, the Company issued a press release entitled, "Live Ventures
4  Announces Biggest Year in Company History Achieving Record Earnings of $8.92 Per Share With
5  Continued Growth Anticipated in 2017." The press release stated that "Live Ventures' financial results
6  were filed today with Securities and Exchange Commission (SEC)," as if it were reporting in the press
7  release the same figures reported to the SEC. It was not. In its Form 2016 10-K, Live Ventures
8  reported its earnings per share as $6.33 undiluted and $5.40 diluted. In fact, the $5.40 earnings per
9  share reported by the Company in its 2016 Form 10-K was also inaccurate since it was the result of
10  onetime GAAP earnings manipulation without which, Live Ventures would have had to report that it
11  actually experienced a net loss for fiscal year 2016.

12        36.    The Live Ventures December 28, 2016 press release stated:

13        Live Ventures Announces Biggest Year in Company History Achieving
14        Record Earnings of $8.92 Per Share With Continued Growth
      Anticipated in 2017

15        LAS VEGAS, Dec. 28, 2016 (GLOBE NEWSWIRE) -- Live Ventures
16        Incorporated (Nasdaq: LIVE) ('Live Ventures' or the 'Company'), a
      diversified holding company, announces today financial results from its
17        fiscal year-end 2016.

18        Reporting its most successful year in the Company's history, Live
      Ventures reported a record $79M in revenues, an increase of 136
19        percent over the previous year, and net profit of approximately
      $17.82M, representing earnings per share (EPS) of $8.92.

20        Stockholders' equity, which is management's preferred measurement
21        for performance, increased by 192 percent over 2015. Since present
      management took over five years ago, stockholders equity has grown at
22        a rate of 100.58 percent compounded annually.

23        'Live Ventures has truly come a long way since its founding in 1968,
      when we were known as Nuclear Corporation of New Mexico,' said Jon
24        Isaac, CEO of Live Ventures Incorporated. 'We are elated with these
      most recent results and are grateful for the hard work of our employees,
25        who were essential to the Company's recent success.'

26        The company's outstanding year-end results were partially attributable
      to the stellar performance at its wholly owned subsidiary, Marquis
27        Industries, and partially to other non-cash income realized in connection
      with the Company's deferred tax assets. These net operating losses
      (NOLs) were accumulated prior to Live Ventures becoming a
28        diversified holding company and allow it to defer over $30M in future

income.  The NOLs provide the company a unique advantage in that it can keep a substantial portion of its income -- which normally would have been expensed at approximately 35 percent for taxes, and redeploy it in other areas such as stock repurchases, retirement of debt, or new acquisitions.  Although a portion of this year's earnings was attributable to its deferred tax assets, management believes the growth factors explained below will offset non-cash income realized during this year.

**Outlook for 2017**

The Company expects multiple factors to impact growth 2017. Management anticipates revenues to increase by well over 50 percent, easily surpassing $120M, and stockholders' equity to grow at a high double-digit rate. In addition, since the acquisition of Vintage Stock closed several weeks after our fiscal year end, none of the results from Vintage Stock is included in this financial report, all of which will figure prominently into the Company's upcoming 10Q filing and future financial results.

Management further expects additional growth in 2017 as a result of recent capital expenditures made at Marquis Industries to expand its highly successful turf product, which has generated enough demand to be backordered by several months. Finally, in furtherance of the Company's previously announced strategic focus to make accretive acquisitions, such as Marquis Industries and Vintage Stock, management is evaluating several additional acquisition targets, which, if successful, would significantly further increase revenues, and potentially EPS, while not requiring the issuance of stock or convertible securities.

'We are extremely optimistic for the growth we expect in 2017. This has been a record year for the Company, in terms of the pace at which we acquired assets, our financial success, and our ability to act quickly when we find an acquisition that fits our profile,' said Jon Isaac, CEO of Live Ventures. 'We look forward to the opportunity to report continued successes.'

Live Ventures' financial results were filed today with Securities and Exchange Commission (SEC) and can be accessed via the Company's website in the investor relations section, or by visiting the SEC's website.

**About Live Ventures Incorporated**

Live Ventures Incorporated is a diversified holding company with several wholly owned subsidiaries and a strategic focus on acquiring profitable companies that have demonstrated a strong history of earnings power. Live Ventures Incorporated provides, among other businesses, marketing solutions that boost customer awareness and merchant visibility on the Internet.  The Company operates a deal engine, which is a service that connects merchants and consumers via an innovative platform that uses geo-location, enabling businesses to communicate real-time and instant offers to nearby consumers. In addition, it maintains, through its subsidiary, ModernEveryday, an online consumer products retailer and, through its subsidiary, Marquis

14

Industries, a specialty, high-performance yarns manufacturer, hard-surfaces re-seller, which is a top-10 high-end residential carpet manufacturer in the United States. Marquis Industries, through its A-O Division, utilizes its state-of-the-art yarn extrusion capacity to market monofilament textured yarn products to the artificial turf industry. Marquis is the only manufacturer in the world that can produce certain types of yarn prized by the industry.  Most recently, the company acquired Vintage Stock, Inc., an award-winning entertainment featuring movies, classic and new video games, music, collectible comics and toys, and the ability to special order and ship product worldwide to the customer's doorstep. Vintage Stock is America's largest entertainment superstore chain.

In December, Isaac Capital Group, our largest stockholder, agreed to lock up all of their shares for five years (through December 31, 2021). To ensure that lock-up arrangement, they exchanged all of their shares for a series of 'common equivalent' preferred stock, which is not redeemable; has no liquidation preference and virtually identical dividends (if any are declared); has no board seats and votes with the common stock; and is convertible back into common stock without any dilution (based on its original exchange from common stock). Accordingly, our common stock was reduced from approximately 2.8 million to 2.0 million shares.

37.   After the filing of the 2016 Form 10-K, and on January 1, 2017, Markowski published an article on *Seeking-Alpha*, touting the Company's business and prospects:

**Seeking Alpha: What is one of your favorite picks for 2017, and, in a sentence or two, why?**

My pick, Live Ventures, Inc. (NASDAQ: LIVE), was one of the micro-caps that I recommended in my November headwinds and tailwinds article.  I am also predicting that LIVE shares will be the top performer for the stock market in 2017 even though its share price has already increased by 50% since being recommended.  LIVE shares rank as my best ever micro-cap find ever for the following reasons:

- Shares extremely liquid for a micro-cap.
- Very dynamic 33 year-old CEO who stepped in to turn around company has since acquired 40% of its shares outstanding.
- Based on my free cash flow analysis the shares are insanely undervalued.
- Diversified holding company business model identical to Berkshire Hathaway's (NYSE: BRK.A) (NYSE: BRK.B).
- Grew by 100% for fiscal 2016 and will continue to grow at 50% to 100%.

38.   At the end of the January 1, 2017 article, Markowski represented:

"I wrote this article myself, and it expresses my own opinions.  I am not receiving compensation for it.  I have no business relationship with any company whose stock is mentioned in this article."

15

39.     On January 6, 2017, Richard Pearson ("Pearson") published an article on *Seeking-Alpha*, alleging that from November 2016 through December 2016, the Live Ventures' stock had been artificially inflated as a result of aggressive paid promotions. In this article, Pearson stated, in pertinent part:

> Live Ventures' stock has shown a repeated pattern over time. When the stock trades at a very low price, a reverse split occurs to raise the price up and reduce the float. At the same time, some new acquisition or corporate development is announced. Simultaneous paid promotions (which have now run into the millions of dollars) help to temporarily drive the stock up. But when the business fails to produce results, the stock price falls again and the process is repeated.

> The most recent promotion campaign saw the stock triple in November to December 2016.

> As in the past, there was a reverse split which coincided with some sort of "news". As in the past, there is the presence of heavily compensated stock promoters. And as in the past, the stock price quickly showed a reaction, tripling in a few weeks.

>                   *        *        *

> Again, the point I am trying to make is that when we see this combination of problems, we should immediately start to be highly concerned about the author and his content.

> But this content didn't come from just any author. It came from Michael Markowski. That makes the problem visibly much bigger.

40.     Markowski was barred by the SEC in 2001 from associating with any securities broker or dealer. The SEC described Markowski's conduct as "egregious" in that he knowingly and recklessly manipulated the market prices of three different securities, "including aggressive and fraudulent sales practices, unlawful solicitation of aftermarket orders during initial public offerings, and delayed execution of the sell orders" of securities customers.

41.     In its opinion issuing injunctive relief against Markowski, the SEC stated the following:

> Markowski and Joseph Riccio, the firm's trader, knowingly or recklessly manipulated the market prices of the securities of three issuers, Capucino's, Mountaintop, Inc. ("Mountaintop"), and Auto Depot, Inc. ("Auto Depot"), beginning with their initial public offerings and continuing through at least November 1990. The complaint alleged that Markowski and Riccio conducted *aggressive and fraudulent sales campaigns to promote the securities, which included making specific price predictions about the securities* . . . .

16

***Markowski's conduct was egregious.*** The complaint in the injunctive action describes the manner in which Markowski knowingly and recklessly manipulated the market prices of three Global-backed securities, including aggressive and fraudulent sales practices, unlawful solicitation of aftermarket orders during initial public offerings, and delayed execution of the sell orders of Global customers.

***Markowski's testimony bespeaks a complete lack of understanding of, and appreciation for, the regulatory scheme governing the securities industry.*** [Emphasis added].

42.    In his January 6, 2017 article, Pearson connected Markowski's prior conduct and his promotion of Live Ventures stock, and stated:

As I see it, Mr. Markowski has acted in a similar fashion with Live Ventures. He seeks to drive up the price in the same way, by inciting "market orders" in a small cap, low float stock. He continues to urge additional buying even as the share price soars, continually raising his target price, using specific prices as he did in the fraudulent conduct above. He then seeks to dissuade investors from selling even as the share price begins to fall apart.

                    *          *          *

Here is a brief list of just a few of the inaccurate statements made by Mr. Markowski in his articles:

For Live, he stated that "Before conducting any additional analysis, I checked out their auditor. I discovered that it was Anton & Chia, which is one of the most respected and SEC approved auditing firms." As shown in the next section. Anton & Chia was cited in September 2016 for multiple egregious audit deficiencies, their clients list largely consists of imploded reverse mergers for China/Asia OTC stocks, many of which either trade for just pennies or no longer report or trade.

He also stated that LIVE had positive Free Cash Flow of positive $2.0 million in Q4 2016. This is provably wrong. In fact, Live Ventures had a Free Cash Flow of NEGATIVE $2.5 million. As a self-described "cash flow expert", Mr. Markowski should certainly be familiar with the standard definition of FCF: "Free cash flow (FCF) is a measure of a company's financial performance, calculated as operating cash flow minus capital expenditures." It is actually very simple and well defined. Yet for some reason, Mr. Markowski decided to add $3.3 million back for prepaid expenses. This is simply an arbitrary adjustment made by Mr. Markowski to arrive at a positive number.

On December 20th, Markowski stated that Live Ventures has an extremely rare "Free Cash 50% yield". As of that date, Live Ventures was already trading at $20, which would mean that Live Ventures was generating Free Cash Flow of $10 per share, or $28 million. Even using the exaggerated numbers provided above does not come anywhere near $28 million in FCF in 2016. And then it gets even better. Markowski states that: "Due to LIVE having an extremely rare Free Cash 50%

17

Yield anomaly its share price will go to a minimum of $50.00 in 2017 regardless of how the S&P 500 performs."

Stock "bulls" commonly try to blame short sellers when a stock price implodes. They try to use this to convince retail buyers to buy the stock. Markowski stated that "Based on 2.2 million shares trading on December 28th, the probability is high that short sales accounted for a significant percentage of the volume." In fact, we can see the amount of short interest over time at NASDAQ.COM. Over the past 4 months, total short interest has ranged from 70,000-90,000, so nothing near the millions of shares that Markowski implies. From the site iBorrowDesk, we can see that total additional shares available to be shorted have seldom been more than 25,000 on any given day. And before he tries to blame the "naked shorting" bogeyman (another favorite excuse and distraction for stock "bulls"), we can see that the SEC also tracks the total amount of shares being shorted "naked." It is called their "fail to deliver list." For Live Ventures, the most recent number of "failed to deliver" (i.e. naked shorted) shares amounted to just 4,054 shares (yes, just four thousand shares). The reality is that short sales have accounted for virtually none of the volume. Anyone who claims 40 years in the industry should be able to find this information in just a few minutes.

Markowski states that "CEO Jon Isaac owns 1.1 million shares". As shown below, Isaac controls over 1.5 million shares, nearly half of which are available for immediate sale via warrant exercise. That is a difference of nearly $10 million into the CEO's pocket and is directly relevant when we are looking at stock promotions.

Beyond the inaccuracies we can see multiple statements which are deeply reckless in his explicit buy "recommendations."

Mr. Markowski urges investors to place "at market" purchase orders.

He also urges investors to place "Good Til Canceled Limit Orders" to buy at a price of $26.25 (even as the share price was plunging to $22). The effect of this would obviously be to support the share price.

He makes statements such as: "Due to LIVE having an extremely rare Free Cash 50% Yield anomaly its share price will go to a minimum of $50.00 in 2017 regardless of how the S&P 500 performs."

Assuming that LIVE's outstanding shares remain at 2.8 million the minimum price for their shares by the end of 2017 could potentially range from $45 to $180.00.

"LIVE's shares are being shorted instead of being aggressively purchased. It is because should an investor or conduct a preliminary analysis and not dig much deeper the tendency is to short instead of buying LIVE shares. Upon investors becoming aware of this anomaly the share price will go to above $100. This report will enable you to fully grasp the significance of the anomaly and why a short squeeze is inevitable." As shown above, anyone with even a few years of experience in the market would know that this information is provably false with just a few minutes of looking.

43. Pearson went on to discuss the Company's acquisition of Vintage, stating:

On November 7th, Live Ventures announced the acquisition of Vintage Stock, a retailer which buys and sells things like used movies (including VHS), music CD's and video games. The cost of the acquisition was $60 million and was done via bank financing (i.e., no stock was issued).

At the time of the acquisition, the stock barely budged. On the day before the acquisition, the stock sat at $10.98. On the day the acquisition was announced, the stock hit $11.52, up a few percent. On the next day, the stock was flat. No one cared.

The reason for the lack of enthusiasm is that trading music CDs and old video games in retail stores is not a growth business anymore. Much of this is now simply done online. Videos, music and games can simply be downloaded without visiting a store. If I want to buy a physical copy, I do so via Amazon for a fraction of the price.

Vintage continues to engage in activities such as movie and video game rentals, just like the now bankrupt Blockbuster. In fact, Vintage actually acquired many of their Dallas area stores directly from Blockbuster and brags that it now offers "over a million titles to choose from in Movies, Music and Video Games." Following the *going-out-of-business* of their local competitor Hastings, Vintage simply moved in to that location in Kerryville, TX. Vintage hopes it will do better than their *bankrupt* predecessor

Vintage also bought a few locations of Borders Books as that company too was going *bankrupt*. Vintage has stated that it follows an 80-20 rule, where the 20% consists of selling books and magazines, just like the *bankrupt* Borders used to do.

Vintage also engages in the odd niche business of repairing scratched music CDs, for those out there who still use music CDs.

Vintage even continues to carry game cartridges for vintage consoles such as Atari and the old Nintendo, which were popular in the 1980s.

There was no detailed 8K released with legacy or pro forma financials, such that we don't    really know what Live Ventures purchased here. But we do know that Vintage has 40 locations spanning 5 states, with 900 employees, such that getting $60 million in bank financing should not have been difficult for the company. Vintage could have certainly borrowed that much money itself.

For example, if Vintage owns $60 million of real estate, the Live Ventures could have just paid $60 million in exchange for $60 million in real estate, with the business itself being largely worthless.

But as we have seen, stock promoters needed some fodder for their promotions. And even though Live Ventures was clearly stepping into the shoes of several bankrupt predecessors, the promoters were able to spin it for a few weeks.

19

1   The website for Vintage describes their inventory of videos, music and
2   games as being "massive". So a second theory is that the "value" here
    was simply that of overvalued obsolete inventory. After all, what are
3   rental DVD's worth today now that everyone can simply stream from
    Netflix (NASDAQ: NFLX), Hulu or Amazon (NASDAQ: AMZN) for
4   just a few dollars without ever leaving their home. If Live Ventures is
    valuing these rental videos "at cost" of $20 or more, then a $60 million
5   valuation could be easily justified. But obviously older titles of used
    rental videos now have a value which is almost nil.

6   Because there has been no detailed 8K filed, we simply have no idea.

7   But just as with the other items of fodder, the promoters have been
    quick to predict multi bagger share price increases based on the
8   minuscule amount of vague and unsubstantiated information released by
    Live Ventures.
9
    (Note: Here is an example of a typical 8K that virtually all companies
10  put out upon completion of an acquisition. It contains all of the relevant
    historical and pro forma financial information along with the detailed
11  terms of the transaction and financing.)

12  It is notable that at the time Live Ventures announced the deal in
    November, that annual sales were immediately expected to increase to
13  $160 million. But just a few weeks later, this number was already
    quickly being reduced to $120 million. They had therefore been
14  overstated by 33%. No explanation for the steep revision was given.

15  The point is this. Live Ventures completed this acquisition in
    November and immediately put out a press release touting several
16  unsubstantiated forecasts. Live Ventures never put out an SEC filed 8K
    with any concrete details. As we have seen in the past, there have been
17  substantial discrepancies between Live Ventures press releases and their
    SEC filings. We literally have no idea what Live Ventures has
18  purchased here because nothing has been disclosed. The company is
    already backing away from their initial vague rosy statements.
19
    But so far the promoters behind Live Ventures have been quick to seize
20  on the acquisition as further proof that the stock is going to catapult
    upwards by several hundred percent in 2017.
21
    Even a casual analysis of Vintage reveals that the company is in various
22  dying businesses including DVD and VHS rentals, CD music exchange
    and CD/DVD scratch repair. Vintage has repeatedly been buying out the
23  locations of other dying businesses such as Blockbuster, Borders and
    Hastings, all of which went bankrupt / out of business.
24

25       44.   Pearson then reported on Live Ventures' December 28, 2016 press release where the

26  Company stated that Defendant J. Isaac (through Isaac Capital Group) had "locked up" all of his

27  shares:

28

In December, Live Ventures announced that:

In December, Isaac Capital Group, our largest stockholder, agreed to lock up *ALL* of their shares for five years (through December 31, 2021) .... Accordingly, our common stock was reduced from approximately 2.8 million to 2.0 million shares.

Isaac Capital Group is controlled by Live Venture's CEO Jon Isaac. He is the largest shareholder.

The message here is clear. The CEO cannot sell any of his shares until 2021. Clearly, this is a strong vote of confidence in the stock, and it has helped support the share price.

*But that assumption is wrong. The following information can be found in the footnotes (part F-19) of the 10K.*

If we look at warrants / options held by Jon Isaac and/or his Isaac Capital Group, we can see that he has control of more than 1.5 million underlying shares in total. This includes almost 590,000 shares underlying his warrants. These warrants have an average exercise price of just $4.14 and they actual EXPIRE in less than 2 years. *THE WARRANTS ARE EXERCISEABLE IMMEDIATELY*.

So here is the kicker, by appearing to lock up "ALL" of his common stock, the CEO supports the share price. He therefore can get a much higher price when he sells nearly 700,000 other shares that no one seems to have noticed. Even if the original shares go to zero in 5 years, the CEO would stand to make more than $10 million if sold at current prices. Without giving the "appearance" of a lockup, this would not otherwise be possible for the CEO.

And again, the warrants can be exercised for just $4.14, they are exercisable immediately and they EXPIRE in less than 2 years. The "lockup" is nonsense.

But it gets even better. In order to affect this apparent "lockup", the CEO "converted" his 800,000 shares of common stock into basically identical preferred shares. As a result, when Live Ventures announced their EPS for 2016, they divided their "earnings" by 2 million shares rather than 2.8 million shares. This is how the company seemingly reported an EPS of $8.92.

*Live Ventures Announces Biggest Year in Company History Achieving Record Earnings of $8.92 Per Share With Continued Growth Anticipated in 2017*

But that $8.92 was **ONLY** announced in the *flashy press release.* It was not included in the SEC filed 10K. (Feel free to run a text search through the 10K for yourself). In the actual SEC filings, we can see that Live Ventures was forced to report the actual EPS number of $5.40.

And as we see next, even that $5.40 was EPS was only the result of one-time GAAP earnings manipulation. Without that manipulation, the

1   company actually would have *reported a NET LOSS, NOT ANY NET*
2   *INCOME AT ALL.*

3       45.     On this news, Live Ventures' share price dropped from $20.67 on January 5, 2017 to

4   close at $18.05 on January 6, 2017, a loss of $2.62 per share, or approximately 13%, on unusually

5   heavy volume of 1.488 million shares.

6       46.     As a result of Defendants' false statements, Live Ventures securities traded at artificially

7   inflated levels during the Relevant Period.  However, after the above revelations seeped into the

8   market, the Company's securities continued to decline, with Live Ventures' stock price plummeting

9   nearly 48% from its $27.68 Relevant Period high.

10      47.     On January 9, 2017, Live Ventures issued a response letter to the Pearson article (which

11  it described as a "negative article[s] recently written about us by those attempting to manipulate our

12  stock for their own profit").  In Live Ventures' response to the Pearson article, the Company at no point

13  denied Pearson's allegations that it utilized the services of paid stock promoters including Markowski

14  (who represented at the conclusion of his articles that he was not paid to write the article).  Further,

15  Live Ventures did not deny that it had reported to investors on December 28, 2016, the Company's

16  earnings per share for fiscal year 2016 was $8.92, but reported the next day to the SEC in its 2016 10-

17  K, filed on December 29, 2016, that Live Ventures' earnings per share was $6.33 undiluted and $5.40

18  diluted.  And it did not to respond to most of Pearson's specific accusations.

19                  **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

20      48.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to

21  redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary

22  duties and gross mismanagement by Defendants.

23      49.     Plaintiff will adequately and fairly represent the interests of the Company and its

24  shareholders in enforcing and prosecuting its rights and has retained counsel competent and

25  experienced in derivative litigation.

26      50.     Plaintiff is a current owner of Live Ventures stock and has continuously been an owner

27  of Live Ventures stock during all times relevant to Defendants' illegal and wrongful course of conduct

28

1  alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action

2  and are prepared to do so.

3       51.     During wrongful course of conduct at the Company, the Board consisted of the Director

4  Defendants.  Because of the facts set forth throughout this Complaint, demand on the Board to institute

5  this action is not necessary because such a demand would have been a futile and useless act.

6       52.     The Live Ventures Board is currently comprised of five (5) members - Defendants J.

7  Isaac, T. Isaac, Butler, Gao, and Sickmeyer.  Thus, Plaintiff is required to show that a majority of the

8  Demand Defendants, *i.e.*, three (3), cannot exercise independent objective judgment about whether to

9  bring this action or whether to vigorously prosecute this action.

10       53.     The Director Defendants face a substantial likelihood of liability in this action because

11  they caused the Company to issue false and misleading statements concerning its future prospects.

12  Because of their advisory, executive, managerial, and directorial positions with the Company, each of

13  the Defendants had knowledge of material non-public information regarding the Company and was

14  directly involved in the operations of the Company at the highest levels.

15       54.     Defendants either knew or should have known of the false and misleading statements

16  that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy

17  that situation.

18       55.     The Director Defendants (or at the very least a majority of them) cannot exercise

19  independent objective judgment about whether to bring this action or whether to vigorously prosecute

20  this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff

21  has not made (and should be excused from making) a pre-filing demand on the Board to initiate this

22  action because making a demand would be a futile and useless act.

23       56.     Each of the Defendants approved and/or permitted the wrongs alleged herein to have

24  occurred and participated in efforts to conceal or disguise those wrongs from the Company's

25  stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein,

26  and are therefore not disinterested parties.

27       57.     Each of the Defendants authorized and/or permitted the false statements to be

28  disseminated directly to the public and made available and distributed to shareholders, authorized

23

1  and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries

2  of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they

3  instituted it.

4       58.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of

5  the duties of due care, good faith, and loyalty, Defendants are unable to comply with their fiduciary

6  duties and prosecute this action.  Each of them is in a position of irreconcilable conflict of interest in

7  terms of the prosecution of this action and defending themselves in the securities fraud class action

8  lawsuit brought under the Securities Exchange Act of 1934.

9       59.     Additionally, each of the Defendants received payments, benefits, stock options, and

10  other emoluments by virtue of their membership on the Board and their control of the Company.

11                          **THE DIRECTOR DEFENDANTS**
                       **ARE NOT INDEPENDENT OR DISINTERESTED**

12

13  **Defendant J. Isaac**

14       60.     J. Isaac is not disinterested or independent, which is admitted by Live Ventures in its

15  2016 DEF 14A, and therefore, is incapable of considering any demand.  J. Isaac is an employee of the

16  Company as its President, CEO, and Chief Financial Officer, and who derives substantially all of his

17  income from his employment with the Company, making him not independent.  As such, J. Isaac

18  cannot independently consider any demand to sue himself for breaching his fiduciary duties to the

19  Company, because that would expose him to liability and threaten his livelihood.  Also, J. Isaac is the

20  son of T. Isaac.

21       61.     J. Isaac is also the founder of the Isaac Capital Group, the Company's largest

22  stockholder holding approximately 49.5% of the Company's outstanding shares of common stock at the

23  time of the events described herein.  By virtue of his control over the Isaac Capital Group, J. Isaac has

24  the sole power to vote the shares of Live Venture's common stock owned by Isaac Capital Group, and

25  as a result, is able to effectively control all matters that require the Company to obtain shareholder

26  approval, including the election of directors to Live Venture's Board of Directors.

27  ///

28  ///

**Defendant T. Isaac**

62.     T. Isaac is not disinterested or independent, which is admitted by Live Ventures in its 2016 DEF 14A, and therefore, is incapable of considering any demand.  T. Isaac is an employee of the Company as its Financial Planning and Strategist Economist, and who derives substantially all of his income from his employment with the Company, making him not independent.  He is also the father of J. Isaac.  As such, T. Isaac cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

63.     Additionally, T. Isaac is the CEO and a director of ARCA, Inc.  Live Ventures directors Butler and Gao also serve as directors of ARCA, Inc. with T. Isaac.  These three joined the ARCA board at the same time (May 2015).  Also, Isaac Capital Group, LLC, owned and controlled by J. Isaac, has an almost 9% shareholder stake in ARCA, Inc.

**Defendant Butler**

64.     Butler is a member of the Company's Audit Committee, and is also the Chairman and is the sole member of the Company's Nominating and Corporate Governance Committee.  In the Live Ventures 2016 DEF 14A, Butler is mentioned as listed as a member of the Audit Committee, a member/chair of the Nominating and Corporate Governance Committee, *and* a member of the Compensation Committee.

65.     As a member (or the sole member) of the Nominating and Corporate Governance Committee, Butler had a duty, among other things, to annually review the corporate governance guidelines of the Company; and monitor and evaluate the performance of the Board and lead the Board in an annual self-assessment of its practices and effectiveness.

66.     Butler breached his fiduciary duty of loyalty by failing to ensure that the Company had an adequate system of internal controls in place to prevent the misrepresentations made by Markowski and the scheme to artificially inflate the Company stock price.  Indeed, Butler knowingly or recklessly disregarded any such controls by permitting Markowski to misrepresent that the articles he published about the Company were not paid for by the Company directly or indirectly.  Accordingly, Butler breached his fiduciary duties in failing to implement such internal controls and, therefore, faces a substantial likelihood of liability.

25

67.     Additionally, on information and belief, Plaintiff alleges that Butler and Live Ventures failed to disclose in Live Ventures' website, press releases or public filings that Butler was a director in ARCA, Inc. with Gao and T. Isaac, and that J. Isaac (through Isaac Capital Group), has an almost 9% shareholder stake in ARCA, Inc.

68.     Based upon the foregoing and other facts contained herein, Butler faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

**Defendant Gao**

69.     Gao is a member of the Company's Audit Committee, and is also a member of the Company's Nominating and Corporate Governance Committee.  In Live Ventures 2016 DEF 14A, Gao is mentioned and listed as a member/chair of the Audit Committee, a member of the Nominating and Corporate Governance Committee, **and** a member of the Compensation Committee.

70.     Assuming Gao is a member of the of the Nominating and Corporate Governance Committee, Gao had a duty, among other things, to annually review the corporate governance guidelines of the Company; and monitor and evaluate the performance of the Board and lead the Board in an annual self-assessment of its practices and effectiveness.

71.     Gao breached his fiduciary duty of loyalty by failing to ensure that the Company had an adequate system of internal controls in place to prevent the misrepresentations made by Markowski and the scheme to artificially inflate the Company stock price.  Indeed, Gao knowingly or recklessly disregarded any such controls by permitting Markowski to misrepresent that the articles he published about the Company were not paid for by the Company directly or indirectly.  Accordingly, Gao breached his fiduciary duties in failing to implement such internal controls and, therefore, faces a substantial likelihood of liability.

72.     Additionally, on information and belief, Plaintiff alleges that Gao and Live Ventures failed to disclose in Live Ventures' website, press releases or public filings that Gao was a director in ARCA, Inc. with Butler and T. Isaac, and that J. Isaac (through Isaac Capital Group), has an almost 9% shareholder stake in ARCA, Inc.

73.     Based upon the foregoing and other facts contained herein, Gao faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

26

**Defendant Sickmeyer**

74.     Sickmeyer is a member of the Company's Audit Committee, and is also a member of the Company's Nominating and Corporate Governance Committee.  In Live Ventures 2016 DEF 14A, Sickmeyer is mentioned and listed as a member of the Audit Committee, a member of the Nominating and Corporate Governance Committee, *and* a member of the Compensation Committee.

75.     Assuming Sickmeyer is a member of the of the Nominating and Corporate Governance Committee, Sickmeyer had a duty, among other things, to annually review the corporate governance guidelines of the Company; and monitor and evaluate the performance of the Board and lead the Board in an annual self-assessment of its practices and effectiveness.

76.     Sickmeyer breached his fiduciary duty of loyalty by failing to ensure that the Company had an adequate system of internal controls in place to prevent the misrepresentations made by Markowski and the scheme to artificially inflate the Company stock price.  Indeed, Sickmeyer knowingly or recklessly disregarded any such controls by permitting Markowski to misrepresent that the articles he published about the Company were not paid for by the Company directly or indirectly. Accordingly, Sickmeyer breached his fiduciary duties in failing to implement such internal controls and, therefore, faces a substantial likelihood of liability.

77.     On its website and in various public filings, Live Ventures states that Sickmeyer founded and serves as the CEO of Fidelitas Development, a full-service marketing firm that focuses on producing an improved return on investment rate for its clients.  However, upon information and belief, Plaintiff alleges that Sickmeyer and Live Ventures failed to disclose in Live Ventures' website, press releases or public filings that LiveDeal is a customer/account of Fidelitas Development and what financial arrangements exist between these two companies.  On the Fidelitas Development website, it identifies LiveDeal as one of its customers:

///

///

///

///

///



78.     Based upon the foregoing and other facts contained herein, Sickmeyer faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

**Defendants Butler, Gao, and Sickmeyer**

79.     During the Relevant Period, Defendants Butler, Gao (Chairman) and Sickmeyer (a majority of the Board) served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, overseeing the Company's internal controls over financial reporting, the Company's disclosure controls and procedures and the Company's code of conduct.

80.     Defendants Butler, Gao, and Sickmeyer breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's press releases regarding its prices per share, as alleged above, and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting issues and deficiencies described above.  Therefore, Defendants Butler, Gao, and Sickmeyer face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**COUNT I**
**Against Defendants for Breach of Fiduciary Duties**

81.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

82.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

83.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

84.     Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  In breach of their fiduciary duties owed to Live Ventures, Defendants caused and facilitated Markowski to misrepresent that the articles he published about Live Ventures were not paid for by Live Ventures directly or indirectly, and failed to properly oversee Live Ventures' business, rendering them personally liable to the Company for breaching their fiduciary duties.

85.     Defendants had actual or constructive knowledge that Defendants caused and facilitated Markowski to misrepresent that the articles he published about Live Ventures were not paid for by Live Ventures directly or indirectly and were thus written for the purpose and effect of artificially inflating the price of Live Ventures' common stock.  Defendants had actual knowledge of the above misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

86.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

87.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe

1    damage to the share price of the Company, resulting in an increased cost of capital, the waste of

2    corporate assets, and reputational harm.

3                                **COUNT II**
**Against Defendants for Unjust Enrichment**

4

5        88.      Plaintiff incorporates by reference and re-alleges each and every allegation set forth

6    above, as though fully set forth herein.

7        89.      By their wrongful acts and the omissions of material fact that they caused to be made,

8    Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

9        90.      During the Relevant Period, Defendants either received bonuses, stock options, or

10    similar compensation from the Company that was tied to the financial performance or artificially

11    inflated valuation of the Company or received compensation that was unjust in light of Defendants' bad

12    faith conduct.

13        91.      Plaintiff, as a shareholder and a representative of the Company, seeks restitution from

14    Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation,

15    including any performance-based or valuation-based compensation, obtained by Defendants due to

16    their wrongful conduct and breach of their fiduciary duties.

17                                **REQUEST FOR RELIEF**

18        **WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

19        A.      Determining that this action is a proper derivative action maintainable under law, and

20    that demand is excused;

21        B.      Awarding, against all Defendants and in favor of the Company, the damages sustained

22    by the Company as a result of Defendants' breaches of their fiduciary duties;

23        C.      Directing the Company to take all necessary actions to reform and improve its corporate

24    governance and internal procedures, to comply with the Company's existing governance obligations

25    and all applicable laws and to protect the Company and its investors from a recurrence of the damaging

26    events described herein;

27        D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable

28    attorneys' fees, accountants' and experts' fees, costs, and expenses; and

1         E.       Awarding such other and further relief as this Court may deem just and proper.

2                            **<u>DEMAND FOR TRIAL BY JURY</u>**

3        Plaintiff hereby demands a trial by jury.

4    Dated: June 12, 2017

5                                Respectfully submitted,

6

7                                **MATTHEW L. SHARP, LTD.**

8                                    */s/ Matthew L. Sharp*
9                                Matthew L. Sharp.
                                432 Ridge St.
10                               Reno, NV 89501
                                  Phone: (775) 324-1500
11                             Fax:  (775) 284-0675
                                  Email:

12                               **GAINEY McKENNA & EGESTON**
                                Thomas J. McKenna
13                             Gregory M. Egleston
                                  440 Park Avenue South, 5th Floor
14                             New York, New York 10016
                                  Phone: (212) 983-1300
15                             Fax: (212) 983-0383
                                  Email: tjmckenna@gme-law.com
16                             Email: gegleston@gme-aw.com

17                             ***Counsel for Plaintiff***

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION

I, Martin Aranzabe, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this __12th__ day of __June__, 2017.

Martin Aranzabe